May it please the Court. Good morning, Your Honors. Counsel, my name is Aaron Bradford, and I am here on behalf of Mr. Eric Underwood and his company My24HourNews.com. Brian Borman and myself, we request two minutes, or reserve two minutes for rebuttal. And we respectfully request that this Court once again reverse and remand the District Court's order on summary judgment. Mr. Eric Underwood's claim of public, actual use of the Erika Mark as early as March 18, 2015, 19 months before Bank of America's claimed priority, required a trial. The Court entered summary judgment in the face of record evidence that established sufficient evidence to establish the three elements that this Court set forth in its last order when we were here before. On remand, the plaintiffs established the following three factual findings. First, that My24Erika, the only place that Mr. Underwood used his mark, was publicly hosted on GoDaddy on March 18, 2015, when he uploaded his user interface, his Erika Mark, and made it available to the world. The District Court assumed that. And that was my next sentence. Well, I want to make sure we're clear that that was the thrust of almost three years of litigation, was whether or not it was in fact true that when Mr. Underwood stated it, that he had launched it on March 18, that was in fact true, and the Court ultimately assumed it. The second thing that we presented evidence on, record evidence, is that the search engine services and personal assistance services were rendered to others prior to Bank of America's priority date. The District Court actually acknowledged that Mr. Olson went to the website prior to Bank of America's priority date, but rejected the rest of the record evidence. The third fact that we established is that when Mr. Underwood launched his website on March 18, 2015, the Erika Mark was present. The Court actually acknowledges this as well on page four of its order, stating that the mark was present, but ultimately concludes that it did not link it to the service. We presented record evidence from witnesses that they connected the Erika Mark with the service. I wasn't sure if you had a question. Yeah, I would like, if you would, to start on that. Sure. Basically the third element. Happy to. We asked you to discuss on remand, and that's the identifying and distinguishing, whether the Erika Mark was identified as providing search engine or personal assistance services. Sure. Happy to. Can you focus on what was on the website itself, rather than on the affidavits at this point, and walk through that? Certainly. As the Court noted, it was important for us to establish, if we wanted to establish rights in the Erika Mark, that we needed to show that it was there, and that the mark was connected, associated with the services. Specifically, as you may recall, the last time we were here, Judge Bell noted that when looking at the actual user interface, there was a direct connection by calling the PICs that Erika suggests Erika's PICs. That was a direct link between the service, which is the personal assistance services that Erika provides. When you land on the website, she recommends based upon- there's also an acronym if you scroll down and read about Erika. Yeah. Just using that word and saying Erika's PICs somehow identified that as a personal assistance service? How was that? Let me take a step back. Where we want to start from is that the analysis comes from the totality of the circumstances, and the Court should look at all of the factors that an individual, when encountering this website, would and could take into account when associating the mark with the service. I want to clarify just one thing. The District Court seemed to focus on whether there was evidence of users and their personal interaction with the site and what they thought or believed. And I think if you look at the case law, it's really about looking at the website itself and looking at the mark as opposed to this personal testimony, isn't it? I tend to agree. We approached this, and during the record, we approached it from multiple different angles. We looked at it from the perspective of what the website actually looked like, and we also looked at it from the perspective of what consumers actually went to the website, and they reached that same conclusion. So it was additional record evidence that supported the finding that Erika was on the website and that consumers actually associated it. But if you go back to the Lanham Act... Well, can I interrupt? That's why I asked you to focus, and I don't think you've finished answering my question yet. That's why I asked you to focus on what was actually on the website, on that third element. Okay. I mean, your first answer is basically the word Erika, and Erika's pics somehow would cause an association. First of all, I'd like to know if there's any support for that, just a word by itself. Sure. Let me start with what's actually in the record about what the website showed. I mean, that could have been Bob's pics. It could have been Nancy's pics. It could have been Carolyn's pics. What makes there be an association with some actual service that's provided? A hundred percent. So if you look at Appendix 1556 to 1564, it details exactly how the website looked when it was launched in March of 2015. It is undisputed that the website looked the same, had the same commercial impression from that date until today. And what it looked like when you arrived, if you were to search for Erika, My 24 Erika, in Google, what would come up in the search results is Erika as being the name of this website. Next to that, it would say, and it does, personal assistant and search engine services in entertainment, in finance, and in news. This is what Google, a search engine, presents to you as a consumer as being what Erika is. And that is intentional on the part of the designer of this website in the metadata, that information. What about when you actually go to the website? Someone is going to use the services, presumably. And I'm presenting this to you in the sense that when you walk into a store, you see the front of the store. This is exactly the same thing. You've arrived at the threshold of the store. The store has the name Erika on it. I'm there. It's got a description. And as you arrive on the website, I'm trying to make sure we get all the record evidence here. As you arrive on the website, your browser tab will say Erika. Underneath that, you see Erika, and it says Erika's pics. And as you go to the website today or tomorrow, those pics will change based upon the information that Erika accesses on the Internet. And Mr. Olson testified to this when he testified at the preliminary injunction hearing that when he went to it originally in 2015, it had certain suggestions for him. And then when he went back later that year, it had different suggestions for him, all associated with Erika's pics. So that's at the top of the page. And as you go down the page, you get to About Erika. And the description of Erika is that it is a trademark of this company and that Erika provides personal assistant and entertainment or, sorry, search engine services. This is the totality of the services. That's if you double-click the small icon in the bottom right, that Erika? That's a characterization of whether it's small or not. I don't believe that that's a fair characterization. Okay. But that's one of the characterizations that Bank of America gives you. It's the smallest font on that, of what you view on that page, right? I frankly have not analyzed it from that perspective. Okay. In part because the court said last time we were here, the important question is not how readily a mark will be noticed, but whether when noticed, it will be understood as identifying and indicating the origin of the service. That's from the TMEP. And so, again, when we're looking at the record evidence, this is all evidence. This is not a matter of fantasy by Mr. Underwood. It is record evidence that on March 15, 2015, these pages were uploaded, and we confirmed that. And the reason I started with point one is because when we went back on remand, Mr. Underwood had to go to GoDaddy and go to the part of the server that he rented from them in order to establish that, in fact, all of these pages were uploaded in March of 2015. But yet the court looked past that, found that despite presenting evidence that these pages were uploaded and available to the public, and despite the fact that consumers testified in live court as well as by declaration that they went to the site and saw the same information, that that wasn't good enough. Let's go back to the recitation. I think the last thing that you rely on, at least on the website, is the – at some point you have – you explain what the acronym, Erica, stands for, which is Electronic Repetitious Informational Clone Application. How does that acronym identify the nature of the service being offered? In fact, it seems like the description of it indicates it's aspirational in the sense that this isn't even happening. We don't have an interactive type search personal assistant at this point, but we're developing it. So how would that cause a user to associate that acronym with the services offered? Well, I'm not certain that the acronym actually bears a lot of relevance to Erica as a mark. Erica, E-R-I-C-A, is the mark. The fact that an acronym is associated with it establishes that it is not just a name, that it is a – that it is, in fact, a service that is being provided. And I disagree that the record evidence establishes that the actual search engine services weren't being provided. There was a description, as you've referenced, that this technology would continue to be developed. But as it currently existed at the time it was launched, it was operating as a search engine. And although there is characterizations that perhaps it's not a good search engine, that's still characterizing the evidence in a way that a jury should evaluate, not a judge at summary judgment. So again, the acronym is, again, part of the totality of the circumstances to establish that this is how the rights holder characterized his mark. And that's E dot. Yes. E period R. With all the dots on it. Yeah, but that isn't what you're saying your mark is. Our mark is Erica, E-R-I-C-A, with the periods. So the acronym Erica that is described somewhere on the website does not really stand for the mark at all. It's a description of what each of the letters stand for. But it's distinct in the sense that it's not the same mark. Again, I agree with you on that. Under the Lanham Act, the rights holder has the opportunity to select a symbol, a word to stand for their company. And what Mr. Underwood and my 24 Erica selected was Erica, E-R-I-C-A, with the periods. And it provided further information to consumers who chose to read about it, what that acronym could stand for. But the mark is Erica, not what it all means. And it's either with the periods or not. Correct. Right. Correct. And that would be consistent with the Trademark Manual of Examining Practices. Correct. Correct. Particularly given the totality of the circumstances that the way this mark was being delivered and utilized and being associated in the minds of the consumers is that it was connecting that service, the search engine services, with that mark, Erica's PICS. And that's what the record evidence established. And to the extent Bank of America has challenged that, and it's important for the court to recognize that the original summary judgment motion took no issue with this. The actual facts that were put before the court that were a matter of dispute had nothing to do with this. This, in terms of the actual arguments that were made, Bank of America said, well, maybe Erica wasn't there. Even though the website was hosted, it was just parked, meaning there was no content there. And that seems to be what the district court assumed was true when the district court said in concluding that the court finds that the plaintiffs have failed to do evidence sufficient to show that their mark was in use before October of 2016. The only way he could reach that conclusion when he had assumed that the website was publicly hosted before that date, he would have to have assumed that the website, while publicly hosted, had no content. That was contrary to the record evidence. I want you to finish answering, Judge McHugh, so I don't want to cut you off. But you are 40 seconds over time. Oh, I'm sorry. If you have anything else to complete your answer. I do not. Thank you, Your Honor. I will reserve the remainder of the time. Well, I'm afraid you have to. I saw the red and it's a negative, sorry. Yeah, that's okay. I didn't realize it was negative. I thought it was saying negative. That's okay. Let's see, we'll hear from the appealee. Good morning, Your Honors. May it please the court, I'm David Bernstein with Deputies of Clinton and we represent Bank of America. I'd like to start exactly where Your Honors have been questioning Mr. Bradford with the third issue, which is putting aside all the declarations, there's an objective question here. Did this website use the term Erica in a way that creates trademark rights? That question, if you answer it no, as the district court did, that is the end of this case. Is it a question of law or a question of fact? So, it's a question of fact, but here there's no dispute of fact about that, Your Honor. Well, there's, I mean, you've got the information on the website and I can look at it, Judge Moritz can look at it, and we can have a different sense of what it does. Ultimately, isn't that a question for the jury of whether it is associated closely enough with the services provided that the user would make that association? I mean, one problem I have with what the district court did here is the district courts didn't focus on the website. The district court said, you have to bring in affidavits of users of what they thought, and that seems contrary to the guidance that we get about how we're supposed to interpret this prong. So, Your Honor, I would, I think the declarations and the so-called testimony of the users goes to the other question, which I hope I'll have just a few minutes to address, which is were any services rendered through this website prior to October 2016? But on the key question of whether the term ERICA is used on this website, assuming it existed, that, by the way, I want to be clear, we do not, that is a disputed issue, but it's not an issue for you to resolve today. Assuming the website, as it appears today, existed back in 2015 and 2016, what the law says is that in order to create an association, there has to be use of the trademark on the website in a way that associates it with the services. And although I agree, Your Honor, that it's a question of fact, the issue here is that there's no disputed question of fact that can go to summary judgment, and I'll explain why. On page 23 and 24 of our brief, we actually talk about the key law on this association. And in the Osmonica case, the principle says that in order to have this direct association, the specimen, the website, that's what they mean when they talk about the specimen, there has to be a reference to the service and that the mark is used to reflect that service. For example, when you go to Google.com, you see the term Google, and right below it, there's a search bar, and underneath it, it talks about trending searches. It is clear that this is a website that is using the Google trademark to identify search engine services. Well, what your opposing counsel told us was when you go to the My24ERICA.com website, it identifies ERICA and personal assistant and search engine services. It's not enough, Your Honor, to say my trademark is ERICA. That doesn't give you trademark rights. Well, what about what he says about what's right next to it? Yeah, so you've got basically three things on the website that use ERICA, Your Honor. There's the terms of service, which is just a legal contract. That doesn't create trademark rights. You've got this about ERICA page where it says, look, ERICA is our trademark, as George Moritz notes, for some future hypothetical service that's still in development. And then the one thing that they're focused on is this line that says ERICA's movie picks, ERICA's TV picks. And the word ERICA is exactly in the same font as that whole line. It would be as if I said to you, you know, my picks for my favorite ski runs at Vail, my picks for my favorite restaurants here in Denver, David's picks for, you know, the hot new movies. That doesn't create a trademark in David. The way a trademark is created, and again, Your Honors, I would look at the Trademark Manual of Examining Procedure. We actually have an example of what it requires on page 24 of our brief. The way a trademark is created is on the website you have the trademark and it identifies the service. Mr. Underwood's website, even if it existed back in 2015 and 2016, doesn't say ERICA is the brand for our search engine services. Here's the search bar and you can do search engines. What it has is a picture of his avatar, which is taken from his 2010 Georgia trademark registration, which this court has already affirmed should be canceled, and in fact it has been canceled. And then there's a list of ERICA's picks. But see, and I realize that's what you argued in your brief and you gave us a screenshot on page 27 of your brief of that. But what your opposing counsel said in argument, and I did not remember this from the brief, but maybe I'm mistaken and maybe I misheard it. But I thought he had said that when you go to the my24erica.com page, it says ERICA, and not ERICA's movie picks. ERICA, in a long parallel to that, is personal assistant services and search engine services. Yes. Is that incorrect? It is incorrect, Your Honors. Because that's what he said that was showed in, I think, 2018, and he says that that was identical to what was present in March of 2015 when he launched the service. For purposes of this appeal, we're going to accept that the screenshots that they submitted, which are actually from 2019 and 2022, reflect the way the website looked earlier. For purposes of this appeal, we'll accept that. Because, I mean, you've got testimony that it did since 2015, and you want to say we can ignore that because it's self-serving, but that's not the rule. No, and I'm saying for today's purposes, we accept that. What I don't want is for Mr. Bradford to say in the future if there's any remand here that I've conceded at that point. We do not. Okay. But I'm going to accept that. But we have the screenshots. They're in the record. The district judge saw them. The use of Erica's pics does not create trademark rights under the law. And I acknowledge, Your Honor, it could be a question of fact. Well, it is a question of fact. It's not could be. It is. But if there's no genuine dispute about whether the mark is used on the website in a way that associates and describes the services, that's the key thing here. This is a movie database. And they used the example of Batman. If you type in Batman, it will pull up through this database, which Mr. Underwood bought from another company, it'll pull up information about the Batman movie. But, Your Honor, my point is that merely doing that doesn't create search engine trademark rights in the term Erica. Now, this court already said that the domain name, myerica, my24erica.com, doesn't create trademark rights. This court's already decided that. So when you go to the website, the places you see Erica are in the Erica's pics at the very bottom where he says Erica's our trademark. And the Acura case that we cite makes the point that merely using SM or TM or saying something is your trademark.  It only is a trademark if you use it in commerce in a way that associates the services with that trademark. Well, what, I mean, if when you use the service, the name Erica comes up. So we've got the testimony from Mr. Olson that the Erica logo trademark was layered over the results when they would come up on the movie database. Well, what he means is it says Erica's pics. In other words, you don't see an Erica trademark like you see the Google trademark right on the front page of Google or Yahoo or Bing or other search engines. You don't see the website saying, you know, I'm Eric Underwood. Hire me and I will be your personal assistant. You know, Underwood personal assistant services. You don't see the use of the trademark in a way that associates it with those services, Your Honor. And, you know, I would point the court to the Asmodica case and to the Sigma S. Karam case, which specifically talk about that important association. There's also one other case that I would ask the court to look at. And it's not one that we cited in our brief. It's from the Western District of Oklahoma. And it's Burns Against Real Networks. And it's at 359 F sub second 1187. Within two days of today, would you do us a 28-J letter, no argument, give us that same site that you just read us? We will do so, Your Honor. Thank you. And the reason I think that case is important is it goes to the second question, which I would like to try to address in a couple of minutes, which is whether services were actually rendered to others. And what that case says is it's not enough just to put a website on the Internet and say, oh, I now have trademark rights. In that case, there was a website that was put up, but there was no evidence that anyone visited it. Here, other than Mr. Underwood's friends and his roommate and Mr. Olson, who I believe was a business associate, there's no evidence whatsoever that any member of the public went to this website. Well, they do have Mr. Underwood's deposition testimony at 85 and 86 that says in 2015 that the website grew the number of movies in the tens of thousands. Given the summary judgment standard, can't we reasonably view the evidence and the like most favorable to Mr. Underwood and infer that Mr. Underwood did not personally put up tens of thousands of movies on his website in 2015? So first of all, Your Honor, what his testimony says is in 2015, I launched the code and there was nothing there. And by 2019, there was all this stuff. It doesn't say when it happened, for starters. Does it not say in 85 and 86 of his deposition that the website grew in the tens of thousands of movies in 2015? Am I wrong about that? Your Honor, I do not recall that testimony. But let me say that's the way this code works. The code for – it's called Code Canyon, where he bought this website database. It's not that people upload information about the movies. The code that this movie database is based on just goes out and pulls this content. Right. His point was I think that the record shows that what he says happens is the more users, the more people who are conducting searches, then the more movies you're going to find. Here's what's missing, Judge Morris. The database grows. Here's what's missing. And so he assumed from that that there was use happening. When you have a website, GoDaddy can give you website analytics. They can tell you how many users were on your website each month. What pages did they look at? How long did they stay on those pages? Did they stay on those pages or did they get referred to Amazon and then buy something from Amazon, in which case Amazon actually pays you a referral? They were given the opportunity before the district court to come forward with evidence. There is zero evidence of any website analytics. This is something that's available for free from GoDaddy. Is that required? Well – Maybe that's the ideal, but is it required to create a correct question? What's required, Your Honor, is some kind of documentary objective evidence, not Mr. Underwood's self-serving evidence, with all due respect. There is case law that says the party's self-serving conclusory evidence is not enough to defeat summary judgment. Well, what makes it conclusory if the deposition testimony is citing a historical fact? It was in the multiple tens of thousands of movies. And you can say, okay, well, he's obviously lying because this helps him and he's the litigant. But that's true in every one of our civil cases. And that's why on summary judgment, the burden is to come forward – the burden is on him to establish trademark rights. We know that because the mark is unregistered. And the burden was on him to come forward at summary judgment to say, look, here's evidence. The Google analytics or the GoDaddy analytics are free, easily available to him. They have no evidence that anyone other than his friends visited the website. He and his friends – let's assume he and his friends did these searches. I'll accept that for today. And let's say their searches helped populate these movies because my understanding is this code will just do it on its own. That – if you look at the Burns case, and we'll send a 28-J letter, merely putting up a website is not enough. In Burns, it was a very similar case where Burns said, I had this website and I was trying to get people to come to it. I was promoting it. I was using keyword searches. I was trying to get traffic. I just didn't get traffic. People weren't coming to my website. It's like the proverbial tree in the forest, Your Honor. You can put the website up, but if no one comes to it, you're not rendering services to the public. But why is that the same as here where we presumably do have evidence that there was traffic based on the increasing database? The only evidence is Mr. Underwood and his friend's declarations, Your Honor. And that is not rendering services to the public. That's not, in fact, rendering a benefit of a search engine under the trademark error code. And so I recognize that the time is up. Let me just say that when you look at the evidence, the district court properly looked at what they came forward with. And the district court properly said there's no genuine dispute that there's evidence that this website was visited by people other than his friends. There was no evidence of services rendered to the public. And objectively, when Your Honors look at the website, there's no evidence that the mark error code is being used as a trademark to distinguish their services. Thank you very much, Your Honors. Thank you. I'm afraid you're out of time. Thank you for your rebuttal. It's very well presented in your briefs and in your oral argument today, the case is submitted.